**Terence B. ALLEN, Plaintiff,**

v.

**George IRANON, et al., Defendants.**

**No. Civ. 97–00175 ACK.**

United States District Court,
D. Hawaii.

July 15, 1999.

Stanley E. Levin, Michael K. Livingston, Thomas R. Grande, Davis & Levin, Honolulu, HI, for Terence B. Allen, M.D., plaintiff.

Gary Hynds, Department of the Attorney General, Employment Law Division, Honolulu, HI, for George Iranon, Eric Penarosa, Guy Hall, defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

KAY, District Judge.

### FINDINGS OF FACT

1. Plaintiff Terence Allen, M.D., graduated from the University of California at San Francisco School of Medicine in 1976.

2. Dr. Kim Marie Thorburn graduated from the same school at the same time. Drs. Allen and Thorburn met in medical school and began living together in 1973.

3. After residency, Dr. Thorburn worked as a staff physician at various correctional institutions.

4. Dr. Allen went through additional training in anatomic and clinical pathology and became a board certified anatomic pathologist in 1982. He worked in the San Francisco Coroner's Office for five years, and the Los Angeles County Coroner's Office for another five years. He also had a private practice as a forensic pathologist for defense attorneys.

5. Defendant Guy Hall was named Warden of the Halawa Correctional Facility ("Halawa" or "HCF") in November 1993, and he remained in that position until November 1995. In November 1995, he became Administrator for the Inspection, Evaluation and Compliance Division of the Department of Public Safety ("PSD" or "Department"). He resigned in July 1998.

6. Defendant George Iranon was the Director of the Department of Public Safety, first in an acting capacity and then as Director from July 1994 through December 1996.

7. Defendant Eric Penarosa was Deputy Director for Corrections from the early 1990s, and has been Acting Warden and then Warden at Halawa since November 1, 1995.

8. PSD had an Internal Affairs unit ("IA"), which had as one of its functions the duty to investigate complaints of misconduct made against employees of PSD.

9. The types of misconduct IA investigated included breaches of security and violations of the Department's Standards of Conduct. The Standards of Conduct, among other things, required employees to treat each other with respect and to cooperate with each other.

10. Dr. Thorburn was recruited to the position of Administrator of the Health Care Division of the Hawaii Department of Corrections in order to bring the Hawaii prisons into compliance with national standards for inmate health care. One of the first projects she undertook was to develop written policies and procedures for the administration of health care in Hawaii's prisons, including Halawa. These policies and procedures were first approved in the late 1980s by then-Director Harold Falk. They were further developed and refined during the tenure of the next Director, George Sumner. All of the relevant policies and procedures were in place when Defendant George Iranon took over the Department in July of 1994. These were the policies and procedures that governed the practice of medicine by Dr. Allen throughout his tenure in the Hawaii correctional system.

11. At that time, there were an insufficient number of physicians employed by the State to provide adequate services to

the inmates, so the State hired private physicians on a "fee-for-service" basis.

12. The Department of Corrections relied heavily upon physicians associated with the Kokua Kalihi Valley Clinic ("KKVC") to provide the additional physicians needed.

13. After Dr. Thorburn arrived, she notified the director of KKVC that she wanted the clinic to hire Dr. Allen so that he could provide services to the Department. Dr. Thorburn disclosed the nature of her relationship with Dr. Allen at that time. Dr. Allen then began working for KKVC and providing services part-time to the PSD on a fee-for-service basis.

14. Halawa housed the State's High and Medium Security units. It had a combined population of approximately 1,200 inmates. Both the High and Medium Security units had Special Holding units, which were segregation cells. Halawa had a medical unit consisting of a Physician II position, a Physician I position, which was part-time, and a nursing staff headed by a Nurse V, who reported directly to Dr. Thorburn. Both the High and Medium Security units had clinics, and the Medium Security Unit had an infirmary.

15. This case is highly illustrative of the inherent tension between security staff and medical staff in correctional settings. Issues of medical autonomy and medical confidentiality were friction points throughout Dr. Allen's ten years of work at Hawaii's correctional facilities. This tension was aggravated by the intimate relationship between Plaintiff and Dr. Thorburn, and further exacerbated by the fact that some of the Halawa staff believed, rightly or wrongly, that Dr. Thorburn favored and protected Plaintiff, always came to his defense, and unquestioningly supported his decisions.

16. In 1990, Dr. Allen was in the Halawa Medium Security Special Holding Unit ("MSSH") waiting to be released from a secured area by the Adult Corrections Officers ("ACOs"). Dr. Allen became impatient. The ACOs had a bulletin board, and on the board were articles and depictions that Dr. Allen found offensive. He had seen the postings on numerous occasions, but had not expressed his displeasure. This time, due to his irritation at having to wait, Dr. Allen began tearing articles from the board. ACO Chico Salgado, who was stationed in the unit, confronted Dr. Allen and told him he had no right to come into the unit and tear things off the bulletin board. The confrontation between Salgado and Dr. Allen escalated, then culminated when Dr. Allen set off a fire alarm. The fire alarm necessitated evacuating the prison. Dr. Thorburn and Dr. Allen both acknowledged that Dr. Allen's behavior regarding this incident was inappropriate.

17. From 1987 through March of 1994, Dr. Allen publicly disclosed on several occasions mistreatment of inmates by ACOs. He provided testimony critical of the prison administration in 1990 at a legislative committee hearing on conditions in the prisons. During this same period he also had disagreements on occasion with security personnel about medical issues, such as his need to examine inmates without shackles, and the need for complete privacy during medical exams. Despite such incidents over this seven year period, Dr. Allen was never referred to Internal Affairs, locked out of a facility, or otherwise disciplined. Rather, these problems were handled administratively.

18. Dr. Allen continued to see signs of inmate abuse at Halawa after Guy Hall was appointed Warden in late 1993. Dr. Allen testified that, although there were no physical signs of abuse, the inmates showed signs of psychological abuse. Dr. Allen sent a memo to Guy Hall in December of 1993, expressing his concern about conditions at MSSH. According to Dr. Allen, such concerns included psychological abuse of inmates, which was manifested in increasing signs of inmate stress, hunger strikes and generalized decompensation. Warden Hall did not respond to Dr. Allen's memo.

19. Dr. Allen consulted Dr. Thorburn about these problems, and she suggested that Dr. Allen call the Attorney General's office. Dr. Allen telephoned Deputy Attorney General ("AG") Tom Farrell, referring to the situation as an "epidemic." Farrell arranged to meet with Dr. Allen on March 1, 1994.

20. Because the alleged mistreatment was so extensive and serious, and because of the possibility of litigation, Mr. Farrell took a sworn statement from Dr. Allen on March 1, 1994. Dr. Allen told Farrell about his memo to Guy Hall in December of 1993, and explained in detail the signs and nature of abuse, warning of a potentially explosive situation. He suggested that the primary problem might be that the inmates and the guards were locked in a cycle of provocation and retaliation, and suggested rotating the guard staff. During this meeting, Dr. Allen also informed Farrell about the nature of his relationship with Dr. Thorburn. According to Dr. Allen, he was an independent contractor, and Thorburn selected the medical consultants for PSD.

21. Although Farrell was concerned about the ethics of the relationship between Dr. Thorburn and Dr. Allen, he did not pursue the matter because of his belief that Dr. Thorburn and the PSD contracting officer were familiar with the State Ethics Code and would not allow one spouse to award sole-source, non-bid contracts to the other spouse's company. Farrell assumed that some other person, such as a contracting officer, was actually making the selection.

22. Mr. Farrell had Dr. Allen's sworn statement stenographically recorded. When the transcript was prepared, Farrell sent a copy to the Director of the Department, George Sumner, who in turn gave it to Guy Hall. Soon thereafter, the guards and inmates whom Dr. Allen was concerned about were separated, but only temporarily. The Special Holding inmates were transferred from the Medium Security Facility to Special Holding cells at the High Security Facility, where their conditions of confinement were not substantially different. Not long after, the MSSH guards were rotated up to the High Security Special Holding Unit, reuniting them with the inmates. The problems that Dr. Allen had reported to Mr. Farrell appear to have continued.

23. At the time he gave his statement to Mr. Farrell, Dr. Allen was already viewed by the security staff at Halawa as an "inmate lover." From March of 1994 through the end of the year, Dr. Allen was subjected to increasing low level abuse and harassment. For example, he encountered repeated interference with his medical clinics and examinations, was held unnecessarily in sally-ports, and was called pejorative names by ACOs. This situation was further aggravated by Dr. Allen's personality and demeaning attitude toward others.

24. In late 1994, Dr. Allen began to suspect that ACOs were listening in on his examinations of inmates through the intercom of the examination room, so he ripped the wires out of the intercom.

25. On January 9, 1995, Dr. Thorburn wrote to Mr. Penarosa, complaining that security staff at Halawa had been obstructing inmate access to health care.

26. After successfully competing through the civil service examination process, Dr. Allen was hired to fill a half-time staff Physician I position on January 15, 1995. Dr. Thorburn recused herself from the selection panel.

27. Warden Hall had no supervisory authority over Dr. Allen, who reported to Dr. Thorburn, the medical director. But Hall did have authority over Halawa. On February 6th, 1995, Guy Hall, acting with the knowledge and approval of Mr. Iranon and Mr. Penarosa, charged Dr. Allen with serious security breaches and locked him out of the facility. The lockout was allegedly due to various breaches of security and Dr. Allen's attitude that security of the prison was not his concern. The Court

finds that although Dr. Allen should have been disciplined for these security breaches, the lockout was extreme, and the situation should have been handled administratively.

28. Dr. Thorburn intervened as soon as Dr. Allen was prohibited from entering the facility, and contacted Edwin Shimoda, Institutions Division Administrator. Shimoda met with Hall and expressed the concerns of Dr. Thorburn that the inmates would not be provided with adequate medical treatment if Dr. Allen was locked out. Shimoda gave a plan to Hall for investigating his security concerns and for training Dr. Allen in security. Based upon Mr. Shimoda's directions, Hall allowed Dr. Allen back into the facility.

29. As a result of the lockout, Dr. Allen had been prevented from entering Halawa for five days. He suffered no loss of pay.

30. The Court finds that Mr. Hall misrepresented certain facts in the February 6th lockout of Dr. Allen.

31. The Court finds that Mr. Hall misrepresented the William Smith incident, the first incident upon which the lockout was based. William Smith was first brought to Halawa in early January 1995, having been convicted of molesting the daughter of Halawa Nurse Mona Hendricks. The Halawa administration knew that William Smith was at risk of being assaulted, having been warned by his attorney, Josie Bayudan, in a telephone call on January 10th. Nonetheless, William Smith was placed into general population in the same facility where his victim's mother worked. On January 22nd, less than two weeks later, William Smith was assaulted and his jaw was broken.

32. The Court finds that Mr. Hall knew no later than January 23rd that William Smith had been assaulted. Mr. Hall testified at trial that he did not learn that William Smith had been assaulted until January 24th.

33. Dr. Allen first saw William Smith on January 24th, after Mr. Smith was returned from the hospital with his jaw wired. The Court finds that although Dr. Allen did not report the assault of William Smith directly to security, he did report the assault up his chain of command to Dr. Thorburn. Dr. Thorburn told Dr. Allen that she would report the assault to Mr. Hall, which she did. Mr. Hall took the position that Dr. Allen did not report the William Smith assault to the Halawa administration through his chain of command.

34. Warden Hall learned that Dr. Allen had treated the inmate, so he and the chief of security spoke with Dr. Allen. Hall testified that Dr. Allen refused to give him any information concerning the assault. Hall further testified that Dr. Allen informed him that there had been a number of occasions on which he had learned of assaults and rapes of inmates and did not report them because security was not his concern.

35. The Court finds that on at least one occasion, Dr. Allen knew of inmates possessing tattoo "needles" and failed to report this information either to Halawa security or up his chain of command, notwithstanding the serious security concerns the possession of such needles by inmates presented.

36. Mr. Hall included as a second basis for the February 6th lockout an allegation that Dr. Allen improperly notified William Smith's attorney about Smith's broken jaw.

37. On January 24, the same day that Dr. Allen first saw William Smith, Dr. Allen notified Smith's attorney about Smith's broken jaw. On the same day, Warden Hall received a telephone call from Smith's attorney, who told Warden Hall that Dr. Allen had called her to report that her client had been assaulted. Dr. Allen testified during trial that the call to Smith's attorney was authorized under the next-of-kin policy, which permits a physician to notify an inmate's next-of-kin in the event of a "serious injury." A "seri-

ous injury" is defined in the policy as follows: "The seriousness of an illness/injury of an inmate or federal detainee is to be determined by the health authority or responsible physician. Generally, a serious illness/injury is one that is life-threatening or likely to cause permanent disability." Dr. Allen determined that Smith's broken jaw constituted a serious injury. Because the policy gives the treating physician discretion to make such a determination, the Court finds that Dr. Allen's notification of Smith's attorney was within Departmental policy, albeit somewhat questionable.

38. The third basis set out by Mr. Hall as a justification for the February 6th lockout involved claimed security breaches arising out of inmate telephone calls allegedly made from the medical unit control booth. The evidence established that there was only a single incident on January 13, 1995, in which a terminally ill inmate was briefly in the control booth with Dr. Allen and ACO Salas, attempting to make a call to his family. ACO Salas instructed Dr. Allen and the inmate to leave, and they did. The Court finds that this attempted telephone call did not justify a lockout. Instead, the Court finds that the incident should have been handled administratively.

39. The Court finds that there are no written policies or procedures regarding lockouts, and that the absence of such policies and procedures is unsound correctional practice. Based on the testimony of the experts, the Court finds that: (1) a lockout is not intended to be punitive; and (2) a lockout is a very serious action to be taken only where an individual's continued presence in the facility would create a security risk. The Court finds that Mr. Hall had minimal justification for the February 6th lockout of Dr. Allen, and that he had reason to know the lockout was not justified. The Court further finds that retaliation was a motivating factor in this lockout.

40. The Court also finds that the process through which the lockout was implemented was inappropriate. In particular, Mr. Hall's failure to notify Dr. Allen and Dr. Thorburn in advance was improper and unsound correctional practice.

41. Mr. Iranon and Mr. Penarosa were notified and approved of the February 6th lockout of Dr. Allen. The Court finds that they knew or should have known that the lockout was inappropriate. The Court further finds that retaliation was a motivating factor in their approval of and acquiescence in the February 6th lockout of Dr. Allen.

42. In addition to locking Dr. Allen out of the facility, Mr. Hall referred the William Smith and the telephone call matters to Internal Affairs. These referrals were made with the approval of Mr. Iranon and Mr. Penarosa. Eventually, these referrals became part of Internal Affairs Investigation 95–034. Investigator Raymond Low was assigned by his supervisor, Chief Investigator Joe Miller, to investigate. Low interviewed Warden Hall, Dr. Thorburn, Dr. Allen, and numerous other witnesses in connection with this investigation.

43. By the time Internal Affairs Investigation 95–034 actually started, Mr. Hall had added two additional allegations to the first three.

44. The first of these two additional allegations involved issues related to medical privacy and Dr. Allen's cancellation of clinic. Specifically, on February 16, 1995, Dr. Allen sought to maintain auditory privacy with inmate Curtis Panoke, and the ACOs refused. Subsequently, Dr. Allen closed the clinic for the day. Although Dr. Allen's cancellation of clinic was unprofessional and warranted disciplinary action, the Court finds that the referral to IA was inappropriate. Rather, the incident should have been handled administratively.

45. On March 1st, Mr. Hall added another allegation. Mr. Hall alleged that Dr. Allen and Dr. Thorburn gave William Smith "preferential treatment" by placing

him in the infirmary while his jaw was wired shut. The Court finds that Dr. Allen was not giving William Smith preferential treatment. Dr. Allen testified that he has treated approximately fifteen inmates with wired jaws, all of whom remained in the infirmary while their jaws were wired. Dr. Thorburn not only confirmed this policy and medical judgment generally, she specifically approved of William Smith staying in the infirmary. Such decisions are solely within the discretion of the medical staff.

46. The Court finds that the Internal Affairs referrals for Dr. Allen's cancellation of clinic and the preferential treatment of William Smith were made by Mr. Hall with the knowledge that they were not proper matters for Internal Affairs. The Court further finds that retaliation was a motivating factor behind these referrals. Additionally, the Court finds that Mr. Iranon and Mr. Penarosa approved of and acquiesced in these referrals, they knew or should have known that the referrals were unjustified and inappropriate, and retaliation was a motivating factor in their approval of and acquiescence in these referrals.

47. On March 7, 1995, Dr. Allen was given his three month probationary performance review. He was rated by his supervisor, Dr. Hubacher, as "more than satisfactory" in every category. Dr. Hubacher noted that "Dr. Allen is an experienced physician who is a strong asset to the medical department." Dr. Hubacher was under the direct supervision of Dr. Thorburn.

48. The final charge brought against Dr. Allen as part of Internal Affairs Investigation 95–034 arose out of an incident that occurred on May 5, 1995, involving ACO Salas. Although there was inconsistent testimony regarding the incident, the Court finds that on May 5, 1995, Salas, who was stationed in the security control unit of the infirmary, discovered that an inmate in the infirmary had contraband cigarettes in his possession. Salas confiscated the cigarettes, pursuant to an established policy which prohibited smoking in the infirmary. However, Dr. Allen had previously ordered that the inmate be allowed to smoke, but had failed to make the proper arrangements regarding the possession of cigarettes by the inmate. Dr. Allen learned what Salas had done, and confronted ACO Salas in the control station, where an argument ensued. Dr. Allen accused Salas of countermanding his medical orders. Dr. Allen left the control station to take the matter up with Nurse Chris Keliipio, as he had been instructed to do in the event of another conflict with an ACO. Salas abandoned his post in the control station and followed Dr. Allen to Nurse Keliipio's office, where a heated exchange took place. Dr. Allen used inappropriate and profane language during this exchange, and pushed Salas in an attempt to direct him out of the office. Salas then attempted to call Warden Hall directly from Nurse Keliipio's office, but Dr. Allen pulled the phone from his hand and, using profanity, told him to use his own phone. Shortly after leaving Keliipio's office, Salas called Warden Hall and reported that he had been assaulted by Dr. Allen.

49. When Warden Hall learned of this incident, he locked Dr. Allen out of Halawa for thirty (30) days without speaking with Dr. Allen or Dr. Thorburn.

50. The Court finds that both ACO Salas and Dr. Allen acted inappropriately in connection with the May 5th incident. The lockout left the facility without a doctor for several days.

51. Once locked out, Dr. Allen was reassigned to OCCC for one week, then went on vacation for three weeks. Dr. Allen received no loss of pay during the lockout period. The Court finds that the lockout was inappropriate, and the incident should have been handled administratively.

52. Dr. Allen met with Mr. Penarosa on the morning of May 9th, at Mr. Penarosa's request, to discuss the Salas incident. Dr. Allen explained what had happened.

Mr. Penarosa, who claimed at trial that he did not remember the meeting, neglected to tell Dr. Allen during the meeting that the decision had already been made to lock him out. Instead, according to Dr. Allen, Penarosa told him that it was no big deal, that these kinds of things happen all the time in a prison, and not to worry about it. Later the same day, Dr. Allen learned that he had been locked out.

53. On May 10th, Dr. Allen wrote a letter to Mr. Penarosa about the lockout. He referenced his meeting with Mr. Penarosa the day before, expressing uncertainty as to whether Mr. Penarosa had contacted Guy Hall after their meeting. Dr. Allen again explained to Mr. Penarosa that he had been instructed to take problems to Nurse Keliipio, and that he was attempting to do so when Salas "left his post and followed me, uninvited, into Ms. Keliipio's office." He also reiterated to Mr. Penarosa that he did not see the incident as a "physical altercation," especially in light of a prior occasion in which he had allegedly been pushed out of a control booth by ACO Salgado. He also pointed out that he was about to leave on vacation for one month anyway. Despite Dr. Allen's entreaties, the lockout was not rescinded.

54. The Court finds that it was unusual and inappropriate for Mr. Hall to lock Dr. Allen out without talking to him about the allegations made by ACO Salas.

55. The Court finds that the May 5th lockout was imposed by Mr. Hall with knowledge that it was inappropriate, and with retaliation as a motivating factor. The Court further finds that Mr. Iranon and Mr. Penarosa approved of and acquiesced in this lockout, that they knew or should have known that the lockout was inappropriate, and that retaliation was a motivating factor in their approval of and acquiescence in this lockout.

56. Prior to the imposition of any discipline against a PSD employee, a pre-disciplinary hearing must be held. On July 12, 1995, Dr. Allen was given notice that a pre-disciplinary hearing was to be held on July 27, 1995, concerning the breaches of security and the Salas incident. The hearing was continued at the request of Dr. Allen's attorney, Ignacio Garcia, to August 24, 1995.

57. On May 4th, Guy Hall signed off on the Special Treatment Plan for "Special Case" inmates at the High Security Special Holding Unit. The Special Treatment Plan provided that full restraints were to be worn by the inmate at all times, and specifically provided that the inmate was to remain in full restraints during sleeping time. The Plan also greatly relaxed the medical monitoring of shackled inmates. The Special Treatment Plan required that weekly reports by both the unit sergeant and medical staff be forwarded to the warden.

58. On May 5, 1995, Guy Hall revealed the Special Treatment Plan to Defendant Penarosa. Hall testified that implementation of the plan was never authorized, and further testified that he was not aware that the plan had been used on Inmate Ulysses Kim by mistake.

59. In May or June of 1995, Halawa inmate Chad Eiten issued a written complaint to Mr. Iranon complaining about abuse of inmates in the High Security Special Holding Unit. ACO Ahlo was assigned to investigate. ACO Ahlo's report was sent to Mr. Iranon on July 5th, with copies of the Special Treatment Plan and the Special Management Plan attached. Mr. Ahlo's report was not produced at trial.

60. Dr. Allen did not return to Halawa until mid-June 1995. During his first visit to the High Security Facility after his return, yet another conflict arose between Dr. Allen and the ACOs. On this occasion, the ACOs refused to remove the shackles from, or allow Dr. Allen medical privacy with, inmate Danny Tupuola, as Tupuola, a convicted murderer, had already murdered another inmate and assaulted an ACO while in prison. Instead of examining the inmate under these conditions, Dr. Allen

refused to see the patient under such circumstances and closed the clinic, thereby leaving other patients also untreated. Dr. Allen then complained to the administration, explaining that he could not work at the High Security Facility under such circumstances and that the clinic would remain closed until appropriate measures were taken. Dr. Allen wrote a memorandum to Guy Hall complaining about the lack of access to inmates at the High Security Facility, as well as the conduct of the ACOs. There is no evidence of any response by Guy Hall. The Court finds that, although the ACOs had legitimate concerns regarding security where a dangerous inmate was concerned, a resolution should have been reached through mutual discussions, such as undoing the shackles while the handcuffs were still secured, and vice versa. In any event, this incident should have been handled administratively, rather than referred to IA.

61. On June 28, 1995, Dr. Thorburn wrote a letter to Attorney General Margery Bronster, responding to a June 7, 1995 letter from Deputy AG Tom Farrell to the PSD procurement officer. Farrell had claimed in his letter that the KKVC contract was suspect because Dr. Allen was associated with the clinic. Mr. Farrell had copied his letter to George Iranon and Guy Hall. Dr. Thorburn's letter to Attorney General Bronster, which was also copied to Iranon and Hall, rebuked Mr. Farrell for his attempt to impugn her integrity. She wrote:

> I believe that Mr. Farrell's ill feelings toward me are because I am viewed as an inmate advocate. My opinion is that Mr. Farrell views his duty as an attorney for the State is [sic] protection of officials, right or wrong, in contrast to protecting the people. What's more, Mr. Farrell is feeding misinformation to Warden Guy Hall, Deputy Director Eric Penarosa and Director George Iranon who are desperate to discredit Dr. Allen and me.

62. In July 1995, Farrell forwarded a copy of Dr. Thorburn's letter to the Ethics Commission at the Commission's request, and thereafter the Commission reaffirmed its position that there was no violation of the Code.

63. On July 19th, Dr. Thorburn wrote a memo to Mr. Penarosa documenting her concerns about inmate access to health care at Halawa. In it, she advised Mr. Penarosa that:

> [t]he situation is even worse at Halawa Special Needs Facility. There, after years of trying to cooperate with security by rearranging schedules, having early morning clinics, putting windows in doors, etc., etc., we are unable to hold a doctor's clinic at the facility. This is because the demands placed on doctors by security interfere with our professional standards. It is too much of a liability to carry on when security will not cooperate with doctors' requests to permit inmates to disrobe, remove shackles, provide privacy, etc., in order to cary [sic] out adequate examinations.

The Court finds that these facts illustrate the inherent tension between the medical and security staff at Halawa and indicate that many of the confrontations that ensued were not necessarily directed at Plaintiff as an individual, but rather at the medial staff in general.

64. Dr. Thorburn met with Mr. Penarosa about her memo several days later. Dr. Thorburn explained to Mr. Penarosa that she had received letters from inmate Danny Tupuola alleging major problems at the High Security Facility, including serious guard-on-inmate brutality. Mr. Penarosa testified at trial that he did not remember the meeting. There is no evidence of any follow up by Mr. Penarosa to Dr. Thorburn's report of possible inmate abuse.

65. On August 21, 1995, while Dr. Allen was boycotting the High Security Unit, Nurse Mona Hendricks showed Dr. Allen Polaroid photos of a high security inmate, Ulysses Kim, and asked that he prescribe

antibiotics for infected ulcers caused by the prisoner's restraints. She told Dr. Allen that the inmate had been in full restraints continuously since August 7th, when he was "taken down" by ACOs. The photos, which were taken the day after the incident, showed four closely grouped and parallel baton strike marks on the back of the inmate's thighs, together with multiple infected sores. Dr. Allen concluded that the photos showed seriously infected wounds and indicated beatings. Dr. Allen further concluded that the infected sores caused by the cuffs could not be treated if the restraints remained in place, and that the inmate should be moved to the infirmary for treatment. Dr. Allen requested that the inmate be moved to the medical unit. Hall told Dr. Allen to examine Kim and report back. Dr. Allen, escorted by Deputy Warden Pikini, went to the High Security Facility and examined Kim. In his report to Guy Hall, Dr. Allen stated that when he asked Mr. Pikini if policy allowed prolonged use of mechanical restraints, Pikini responded that there was a "new policy" allowing the use of restraints without medical supervision until the inmate behaves. Dr. Allen ordered inmate Kim admitted to the infirmary.

66. Once Ulysses Kim had been admitted to the infirmary, he asked Dr. Allen to notify his brother, who was an ACO at another facility. Dr. Allen also obtained Kim's consent to speak to the press. Dr. Allen contacted Kim's brother on August 21, 1995 and informed him that Kim had been beaten by ACOs. Kim's brother then called the media. On August 22, 1995, David Waite of the Honolulu Advertiser called Dr. Allen and interviewed him about the Kim incident. On August 23, 1995, a newspaper article appeared, quoting Dr. Allen and giving his opinion as to what had happened to Kim.

67. Dr. Allen testified that he went public with the Ulysses Kim incident for the following reasons: (1) his prior reports of brutality and other problems had effectively been ignored by Warden Hall and the Administration; (2) there was every indication that there would be an attempt to cover-up the Ulysses Kim incident; (3) Deputy Wardens Pikini and Sequiera had trivialized the injuries and circumstances surrounding the Kim incident, and Deputy Warden Pikini had alluded to a "new policy" permitting such restraints; (4) there had been a number of recent letters and complaints from inmates in the special holding unit about brutality that had been ignored; and (5) Dr. Thorburn's direct report to Mr. Penarosa about alleged abuses was ignored.

68. The Kim incident prompted Director Iranon to request investigations by both the FBI and the Attorney General's office. It was also recommended that Hall and others be disciplined for the Kim incident. However, Ted Sakai testified that although he intended to pursue the issue of disciplinary action, he was unable to find a qualified hearing officer to preside over the disciplinary proceedings. Consequently, no one has been disciplined for the abuses.

69. On August 24, 1995, a pre-disciplinary hearing was held before Raymond Brewer, a departmental hearing officer, on the allegations of security breaches by Dr. Allen and the altercation with ACO Salas. Dr. Allen was represented by an attorney. The hearing officer found that Dr. Allen had: (1) improperly communicated confidential information to an attorney without the release of the patient or permission of the director; (2) improperly attempted to accomplish a security related goal by ordering that an inmate be held in the infirmary instead of the general population; (3) improperly refused, on two occasions, to provide medical treatment because of dissatisfaction with the conditions in the clinic; and (4) verbally and physically abused ACO Salas. Dr. Allen grieved this ruling, and the grievance was still pending at the time Dr. Allen resigned.

70. As a consequence, by letter dated October 11, 1995, Brewer forwarded to Director Iranon a recommendation that

Dr. Allen be suspended without pay for five days. It was Director Iranon's practice to accept the recommendations of hearing officers unless there were circumstances that came to his attention which made the recommendation seem inappropriate. According to Mr. Iranon, no such circumstances were brought to his attention in Dr. Allen's case, so he approved the recommendation of the hearing officer.

71. On August 29th, Deputy AG Farrell called the Hawaii State Ethics Commission concerning the KKVC contract and his prior allegations of improprieties arising out of the relationship between Dr. Allen and Dr. Thorburn. On that date, unbeknownst to Farrell, Dr. Allen was no longer a KKVC employee. Rather, Dr. Allen had been a State employee for 8 ½ months.

72. Immediately following the media coverage of the Ulysses Kim incident, Mr. Iranon ordered an Internal Affairs investigation. Mr. Iranon testified that he was not upset or angry with Dr. Allen for blowing the whistle, and that his attitude towards Dr. Allen did not change after the Ulysses Kim incident. Based on the credible testimony of Martha Torney, the Court finds that Mr. Iranon was, not surprisingly, frustrated with Dr. Allen.

73. The Court finds that the contemporaneous notes taken by Walter Ozawa at Director's meetings with Mr. Iranon and others provide a credible account of events during the months of September and October, following the Ulysses Kim incident.

74. Mr. Ozawa's notes reflect a flurry of activity in the weeks following the breaking of the Ulysses Kim story. As early as September 11th, it was apparently understood by the Director and his senior staff that portions of the Special Treatment Plan violated Department policy. There was also recognition of the obvious inconsistencies between the Special Management Plan and the Special Treatment Plan, especially the provision in the Special Treatment Plan for full restraints while sleeping. Also by September 11th, Mr. Iranon appeared to have decided that he needed a new medical director. Two days later, Iranon called Dr. Thorburn to the meeting to ask her why she was fighting him on the release of the Kim medical records. In the process, he told Dr. Thorburn that he would move to create a permanent State Medical Director position. His frustration over the medical record department's refusal to hand over the Ulysses Kim medical records without proper authorization is evident from the notes of many of the meetings during September and October.

75. During a September 15th staff meeting, Director Iranon expressed his concern that personnel "have no 'trust' in chain of command so go to media." This same theme resurfaced at the beginning of the staff meeting three days later, on September 18th. During that meeting, Mr. Iranon was quoted as saying that he was "tired of media that we could have prevented." Mr. Iranon announced that a special Warden's meeting on the subject would take place on September 27th.

76. The September 18th staff meeting then turned to a lengthy discussion of Guy Hall's contentions that both Mr. Penarosa and Mr. Iranon knew and approved of the Special Treatment Plan, and that he was being "hung out there by himself." During this meeting, Guy Hall appears to have explained why both Mr. Penarosa and Mr. Iranon must have known about the Program. The notes state that "Guy upset to read we don't know about policy for restraints/shackles," and "Guy Hall unhappy that Director, Dep–C claiming ignorance of 'Program.'" Mr. Ozawa noted Guy Hall's reference to the Chad Eiten investigation in July, during which Director Iranon was given a copy of the Special Treatment Plan. Mr. Iranon responded that he was not aware of "Oku's Program" until after the Ulysses Kim incident. Guy Hall then reminded Mr. Iranon in greater detail about the allegations of brutality by Chad Eiten, and how the investigator's "report

of findings" was sent to the Director on July 5, 1995, with copies of the "Program" attached. Guy Hall's assumption was that both Mr. Penarosa and Mr. Iranon knew about the Special Treatment Plan. Mr. Iranon then reiterated that "parts of 'Program' do conflict with Department policy," and expressed concern that the policy was seen by Mr. Penarosa and no action was taken. Iranon is then quoted by Ozawa as stating that it was "not my job to review in detail." Nonetheless, Mr. Iranon stated that he did not "want Guy to be hanging out there by himself." Guy Hall responded that he wanted the Department "to hang in with HCF; not say anything in contradiction to what he (Hall) is saying." The Director concluded the meeting by saying "if we have to take the hit ... we take the hit together." Hall testified at trial that he never authorized the Special Treatment Plan's implementation, and that he was unaware that it had been implemented at all.

77. Approximately one week after the Ulysses Kim story broke, Dr. Thorburn called a meeting of the medical staff that had been seeing inmates in the High Security Special Holding Unit during the time period in which the Special Treatment Plan had been implemented. She verbally reprimanded the staff members who had failed to report medical problems, and reminded them of their duty to report such incidents.

78. Shortly after Dr. Thorburn had reprimanded her staff for neglecting to report the abuses associated with the Special Treatment Plan, some members of the medical staff met privately with Mr. Penarosa in his downtown office. Dr. Allen and Dr. Thorburn were not included. The Defendants presented no evidence regarding the content or purpose of the meeting. Mr. Penarosa claimed to have little or no memory of the meeting. Also, Mr. Penarosa claimed not to have any recollection of a follow-up meeting with staff concerning additional complaints against Dr. Allen and Dr. Thorburn.

79. On September 27th, Mr. Iranon convened the special Warden's meeting which was referenced in Mr. Ozawa's notes from September 18th. According to Mr. Ozawa's notes, Mr. Iranon began his remarks at the Warden's meeting by saying he was "upset, angry, also upbeat." He stated that he was tired of being blamed, of lawsuits, and of being the butt of jokes. He stated that I "need your support in this room to clean house." He emphasized that the chain of command had to have guts and a backbone, and admonished the wardens for being "gun shy—to take personnel action against our people." He emphasized that he did not "like infighting among our people," and warned, "[i]f you're not with me, you're against me." He appears to have ended these remarks with an admonition to "work as a team," and with the statement that the staff was either "on my team or go."

80. The Court heard two very different interpretations of this meeting, one from Mr. Ozawa and one from Martha Torney. Mr. Ozawa interpreted Mr. Iranon's remarks as "team building." Martha Torney, on the other hand, took offense at Mr. Iranon's remarks. She testified that "in that meeting, he was angry and frustrated, and it was not a team-building meeting. I found it very disturbing for him to try to put a line on the ground, either you are with me or you are against me. It's kind of like saying, my department, right or wrong; I can't subscribe to that."

81. It is clear from Mr. Ozawa's notes that Mr. Iranon and his senior staff were aware on October 9th that the Ulysses Kim matter might come up at a Legislative Hearing scheduled for October 16th.

82. The KKVC contract payment came up at the Director's staff meeting on October 9th. Mr. Ozawa's notes from the meeting read, "[f]ollow up on KKVC contract payment." On October 10th, the Hawaii Ethics Commission sent a letter to Deputy AG Farrell and Dr. Thorburn advising that there was no violation of the

State Ethics Code in connection with the KKVC contract. The following day, Mr. Iranon stated that he received an anonymous complaint from a Halawa medical unit employee alleging that Dr. Allen received special and favored treatment from Dr. Thorburn as a result of their personal relationship. At trial, Mr. Iranon remembered little about this anonymous complaint. On October 12th, Director Iranon issued a lengthy memorandum to Dr. Thorburn, detailing the anonymous complainant's claims regarding the purported special treatment of Dr. Allen, and ordering her to respond by October 19th. Dr. Thorburn responded to Mr. Iranon's memo on October 20, 1995.

83. On October 11, 1995, Director Iranon notified Dr. Allen that he would be suspended for five days, pursuant to Mr. Brewer's recommendation. At the request of Dr. Thorburn, the suspension was modified so that Dr. Allen would be off work only one day a week for five weeks.

84. Dr. Thorburn testified that on Thursday, October 12th, she hand-delivered copies of the legislative testimony to be submitted by Dr. Thorburn and Dr. Allen at the October 16th hearing, although Dr. Allen's written testimony is dated October 14th. Dr. Allen's written testimony was extremely critical of the administration.

85. The October 12th Director's staff meeting appears to have been focused on preparing key staff to testify at the October 16th legislative hearing. A special trainer was brought in to brief Mr. Iranon and senior staff on testifying before the legislative committee.

86. The Court rejects Mr. Iranon's testimony that he did not find out about the legislative hearing until the day before the hearing through a phone call from the committee chair. Mr. Ozawa's notes make it clear that Mr. Iranon knew about the legislative hearing by October 9th.

87. On October 16, 1995, Dr. Allen and Dr. Thorburn presented testimony to the State legislature complaining about interference with their medical decisions, the inadequate medical care at the High Security Facility, and inmate mistreatment and abuse. Many of the same members of the medical staff with whom Mr. Penarosa had met following the Ulysses Kim incident· appeared at the hearing to provide testimony favorable to Guy Hall and the administration.

88. The day following the legislative hearing, Defendant Iranon announced a major restructuring of his administration. Although this restructuring is not reflected in the portion of Mr. Ozawa's notes which were provided to the Court, Mr. Iranon claimed that it had been in the works for months, and was not in response to the Ulysses Kim incident. The Defendants provided no documentary evidence showing that this restructuring was in the works for months, although Mr. Iranon testified that such restructuring required the Governor's approval, which he testified was secured in June.

89. In any event, Guy Hall was removed as warden and placed in charge of the Inspection arm of the PSD. Mr. Penarosa was retained as Deputy Director, but was also made acting Warden of Halawa. Ted Sakai was selected to fill the new position of Chief of Staff.

90. On October 27th, Dr. Thorburn circulated a memo to medical staff, Mr. Iranon, Mr. Penarosa, and Mr. Sakai, notifying them that Dr. Allen had been temporarily assigned to the Physician II position at Halawa. Her memo emphasized that Dr. Allen would be "ultimately responsible" for clinical services and final medical judgments, including the "conditions and facilities to perform adequate examinations."

91. Back on August 29, 1995, only days after the Ulysses Kim story had broken, Guy Hall received a letter from Richard Ney, the attorney for Halawa inmate Antony LaPierre. The letter complained about Dr. Allen's failure to approve of elective

surgery to remove a ganglion cyst on Mr. LaPierre's wrist. The letter was processed through channels to Mr. Iranon, who requested that Dr. Thorburn draft a reply. The response from Mr. Iranon and Dr. Thorburn, which was copied to Guy Hall, fully supported Dr. Allen's refusal to perform Mr. LaPierre's elective surgery, noting that this decision was consistent with departmental policy.

92. Mr. LaPierre is regarded by many as one of the most manipulative inmates at Halawa. It is also undisputed that he prefers to reside in either the medical unit or the mental health unit, Module B, where the conditions of confinement are far preferable to the special holding cell. He has used threats of suicide, including serious suicide gestures and ideation, to manipulate his way into the medical unit or Module B for months on end.

93. None of the mental health professionals at Halawa were willing to serve as the leader of the mental health team. Dr. Allen, who was serving as the acting Physician II at Halawa at the time, agreed to serve as team leader.

94. During Mr. LaPierre's stay in the infirmary from September 27th through November 13th, Dr. Allen noted that Mr. LaPierre was "showing no therapeutic progress, no goal, no improvement—basically holding medical unit hostage to threat of suicide." Dr. Allen suggested that "under these circumstances we need to create some incentive for improvement," and recommended that Mr. LaPierre's conditions of confinement in the infirmary be restrictive rather than permissive. Dr. Allen placed his suggested plan for LaPierre on hold, pending evaluation by psychologist Dr. Carlson. Dr. Carlson rejected Dr. Allen's recommended treatment plan for Mr. LaPierre. Accordingly, Mr. LaPierre continued under normal infirmary conditions, a process that Dr. Allen thought was counter-therapeutic.

95. On October 26th, Mr. LaPierre had his ganglion cyst removed in the infirmary by a volunteer physician, Dr. Frauens.

Both Dr. Allen and Dr. Thorburn assisted in arrangements for the surgery.

96. On November 24, less than two weeks after he was discharged from the infirmary to Module B, LaPierre was readmitted to the infirmary after making threats of suicide and demonstrating suicidal gestures. The mental health team met to discuss LaPierre's case, and a team decision was made that Dr. Allen would follow LaPierre and try to create an incentive for change through a therapeutic lock down in the infirmary, with the opportunity for restoration of privileges.

97. On November 30, 1995, Mr. Ney wrote a letter to Acting Warden Penarosa, complaining that his client, Inmate LaPierre, had been mistreated by Dr. Allen. Ney claimed that "Allen ordered Mr. LaPierre be placed in a 'stripped' cell, with only a mattress … deprived of a blanket and clothing, except for his underwear." According to Ney, Dr. Allen was retaliating against LaPierre because he had received the operation on his wrist.

98. Penarosa forwarded the letter to Internal Affairs, through Iranon, recommending that an IA investigation be conducted. In a memorandum dated December 4, 1995, Penarosa stated:

There is no doubt that inmate LaPierre is a constant complainer. However, it appears that Dr. Allen's [sic] may be retaliating against LaPierre for the medical surgery he received from volunteer surgeons, which Dr. Allen's [sic] denied. Recent complaints from Halawa medical staff indicates [sic] that Dr. Allen's [sic] treats other inmates he dislike [sic] similarly. The doctor's behavior towards inmate LaPierre and other inmates may be a civil rights violation.

99. After he received Mr. Ney's November 30th letter regarding Mr. LaPierre, Mr. Penarosa sought and obtained Mr. Iranon's approval to refer the matter to Internal Affairs. Mr. Iranon also requested an investigation by the Attorney General. Neither Mr. Penarosa nor Mr.

Iranon contacted Dr. Allen or Dr. Thorburn, or anyone else who might shed light on Mr. Ney's allegations.

100. While an appropriate response to Mr. LaPierre's complaint may have been to refer the matter to Dr. Thorburn for investigation and resolution, the Court finds that referral of this matter to IA may also have been appropriate, considering that it dealt with an alleged civil rights violation and potential litigation.

101. On February 8, 1996, Mr. Iranon determined after a meeting with Rudy Alivado and Ted Sakai that the LaPierre matter was not an Internal Affairs issue, and ordered the Internal Affairs investigation of LaPierre terminated. On February 29th, Ted Sakai noted on this memo that "IA to recommend that inmate seek own recourse perhaps through medical conciliation panel." The LaPierre Internal Affairs investigation continued, notwithstanding these notes from Mr. Iranon and Mr. Sakai.

102. LaPierre was discharged to Module B on December 4, 1995, but was transferred back to the infirmary a little more than a month later, on January 29, 1996, based on suicidal gestures and ideation.

103. LaPierre learned of the Internal Affairs investigation of Dr. Allen by January 11th, at the latest. On January 11th, Mr. LaPierre wrote to the head of Internal Affairs, Joe Miller, thanking him for opening the investigation.

104. On February 8th, Dr. Allen was provided by a member of the health care staff with a memo from Internal Affairs investigator Raymond Low, announcing an "official" Internal Affairs investigation into the treatment Dr. Allen had provided and was then providing to Mr. LaPierre. The memo ordered medical staff to provide information, including their opinions, regarding Dr. Allen's medical care of Mr. LaPierre.

105. Dr. Allen concluded that the Internal Affairs investigation would wholly undermine the therapeutic purpose behind the mental health team's treatment plan for Mr. LaPierre, since it provided LaPierre with an incentive to stay in therapeutic lockdown. Dr. Allen therefore discharged LaPierre from the infirmary with the concurrence of the mental health team.

106. While Low was looking into the LaPierre matter, a number of incidents were brought to the attention of Internal Affairs in which Dr. Allen allegedly got into confrontations with the medical staff. These all occurred after commencement of the investigation into the LaPierre matter.

107. Nurse Barbara Kysar complained that on May 3, 1996, Dr. Allen approached her and began yelling at her in an intimidating fashion. According to Kysar, Dr. Allen had been making pointed comments about the Internal Affairs investigation and how the nurses were complaining to IA about him. On May 3rd, Dr. Allen came into Nurse Kysar's office and slammed down a medical chart and demanded to know what was going on in the unit. According to the nurse, Dr. Allen was standing less than eighteen inches away, yelling at her.

108. Low prepared a complaint and forwarded it up his chain of command. Subsequently, he was directed by his supervisor to investigate the incident. Investigator Low concluded that there was evidence to support the allegation that Dr. Allen had violated the Standards of Conduct by throwing down the file and yelling at the nurse, and Low forwarded his findings to the supervisor of IA.

109. Also during the investigation of the LaPierre case, a complaint was made by Nurse Mona Hendricks that on May 13, 1996, Dr. Allen yelled at her, and continued to yell at her despite her efforts to calm him down. According to Hendricks, she had asked Dr. Allen if it were possible to discharge from the infirmary an inmate with a wired jaw, and Dr. Allen started yelling at her and calling her "Dr. Mona."

110. Low was directed by his supervisor to investigate the incident. Low concluded there was evidence to substantiate the allegation that Dr. Allen had violated the Standards of Conduct by yelling at the nurse, and he forwarded his report to the IA supervisor.

111. On July 29, 1996, janitor Kenneth Cho, clerk Pam De Guzman, Nurse Kysar, Nurse Calpito, medical records technician Lucy Santiago, ACO Lechmann, and Health Care Administrator Keliipio all submitted incident reports indicating that a confrontation had occurred between Dr. Allen and two women. According to the reports, Dr. Allen yelled first at Nurse Kysar, then at Health Care Administrator Chris Keliipio.

112. Low was directed by his supervisor to investigate the matter. Low concluded that there was evidence to support the allegations that Dr. Allen had violated the Standards of Conduct by yelling at the nurses, and he forwarded his report.

113. Health Care Administrator Keliipio submitted a report that on July 31, 1996, Dr. Allen got into another loud argument with Nurse Kysar. Similar reports were also submitted by Nurse Hendricks and ACO Patrick Hamlow. Investigator Low was assigned to look into the matter, concluded there was evidence to substantiate the allegation that Dr. Allen had yelled at the nurse, and forwarded his report.

114. The Court finds it evident that Dr. Allen lacked self-control and patience in dealing with the nurses and ACOs at Halawa, which led to numerous shouting encounters and other inappropriate actions on Dr. Allen's part. However, the Court also finds that the complaints from the three senior nurses that Dr. Allen had engaged in verbal abuse during encounters with them were improperly investigated by Internal Affairs, rather than handled administratively.

115. On December 27, 1995, shortly after the LaPierre Internal Affairs investigation was authorized by Defendants, the announcement of the internal vacancy for the permanent Halawa Physician II position was made. By December of 1995, Dr. Allen had been Acting Physician II at Halawa for four months. He was the only State-employed physician at the facility.

116. Dr. Allen applied for the Physician II position, as expected. A panel was selected to test and interview him in January of 1996. Dr. Thorburn recused herself from the panel, although she selected the panel which would interview the candidates and drafted the questions and answers the panel would be using. Dr. Allen was the only applicant for the Physician II position, and scored very high on the exam. It is undisputed that he was technically qualified for the position. It is also undisputed that he was selected for the position by the panel and by the Health Care Division Administrator, Dr. Thorburn.

117. At this time, Dr. Thorburn was having conflicts with both the nursing staff at Halawa and Director Iranon. Dr. Thorburn proposed that she and Iranon engage in mediation to attempt to resolve disputes between them, and Director Iranon agreed.

118. On February 7, 1996, Joe Miller sent a confidential memo to Mr. Iranon reporting that Internal Affairs and the personnel department had placed a hold on Dr. Allen's promotion to Physician II pending the completion of the investigation into inmate LaPierre's allegations of retaliation by Dr. Allen.

119. Mr. Iranon testified that he did not recall seeing this memo. On February 8th, Mr. Iranon ordered the LaPierre investigation terminated. Mr. Iranon told Dr. Thorburn during their mediation session on that day that he wanted to open the Physician II position for competitive recruitment because of his concern over the nepotism issue with Dr. Thorburn supervising Dr. Allen. Mr. Iranon testified that he did not remember this discussion. Dr. Thorburn testified that she acquiesced,

confident that Dr. Allen would prevail in any fair open recruitment process.

120. The Court finds that the opening of the Physician II position for competitive recruitment was consistent with PDS policy. Section 8.2 states:

If an IVA produces less than three qualified internal applicants, departments may request a waiver from the Director of the Department of Human Resources Development to allow the consideration of existing inter-departmental competitive and/or non-competitive transfer/demotion requests from regular employees of the jurisdiction.

Mr. Iranon testified this procedure was followed. Moreover, Dr. Thorburn, who was evidently Dr. Allen's spokesperson in many matters, agreed to open up the selection process once Mr. Iranon expressed his concerns about the appearance of nepotism if Dr. Allen were the only candidate considered for the position.

121. Dr. Thorburn tendered her resignation during her second mediation session with Mr. Iranon on March 22, 1996.

122. On April 10th, Dr. Thorburn wrote to Mr. Iranon pointing out that her resignation removed the barrier Mr. Iranon had cited for hiring Dr. Allen. Her memo explained to Mr. Iranon that Dr. Allen had qualified for the position under the First Consideration Policy, and suggested that "it would be fair to grant it to him."

123. Thereafter, the Physician II position was opened for competitive recruitment. Dr. Allen applied along with three other candidates. Following interviews and testing, a two-member panel that included Dr. Taniguchi, with whom Dr. Allen had several disputes regarding patient care, ranked Dr. Allen first. His score on the interview and testing was up to ten percentage points higher than the next two candidates. Moreover, Dr. Allen had been acting Physician II for over seven months and had almost a decade of experience in correctional medicine. The candidate who

was ultimately selected, Dr. Paderas, had never practiced in a correctional setting.

124. On November 8, 1996, Dr. Taniguchi wrote to Mr. Iranon, remarking that civil service regulations might require him to select Dr. Allen. Although his memo characterized the scores of the three applicants as "statistically equivalent," he testified that these were his words and only meant the scores were within ten percentage points of each other. Dr. Taniguchi ended his memo with the statement, "Dr. Allen may have to be selected for the Physician II position according to civil service rules, but I am expressing my reservations regarding his selection." Dr. Taniguchi testified that he did not provide the personnel department with a copy of his November 8th memo to Mr. Iranon. Dr. Taniguchi also testified that his understanding of the civil service requirement that he select Dr. Allen was based on conversations he had with the personnel department prior to sending his November 8th memo to Mr. Iranon.

125. Dr. Taniguchi then testified that sometime after November 8th, he was contacted by someone and asked to attend a meeting in the personnel department. Although he could not recall precisely when the meeting occurred, he testified that it was not the same day that he sent his memo to Mr. Iranon. Dr. Taniguchi did not ask for the meeting, and could not explain how it came to be called. Dr. Taniguchi testified that he could not remember who was at the meeting or what was discussed, although he did remember that he was advised at that meeting that he did not have to hire Dr. Allen. Dr. Taniguchi testified that he therefore selected the second ranked candidate, Dr. Paderas, over Dr. Allen.

126. On November 8th, the same day that Dr. Taniguchi sent his memo to Mr. Iranon indicating his concern that civil service regulations required that he hire Dr. Allen for the Physician II position, Dr. Taniguchi sent a notification to Dr. Allen that he had not been selected for the posi-

tion. The Court finds the timing of these events to be suspicious.

127. Dr. Allen requested an explanation for the decision not to hire him. On January 3, 1997, Personnel Officer Roy Yamamoto wrote to Dr. Allen with an explanation. Yamamoto characterized the open recruitment scores as "relatively equal," and explained that the selection of Dr. Paderas was made on the basis of seniority, referencing Article 13 of the Collective Bargaining Agreement. However, this position regarding the open recruitment process is doubly flawed. First, the threshold criterion is not a "relative equality" in scores. According to the language of the applicable civil service regulation, seniority only applies when "there is no material difference between the qualifications of employees concerned." Hawaii Administrative Rules, Section 14-3.03-3. Second, Mr. Yamamoto's letter reflects a misapplication of Article 13 of the Collective Bargaining Agreement. Subparagraph 5 of Article 13 the Collective Bargaining Agreement specifies the "order of priority" for making promotions based on seniority. Dr. Allen, as an employee "within a division on the island where the vacancy occurs," had a first level priority. Dr. Paderas, as an employee "within the jurisdiction on the island where the vacancy occurs," had only a level five priority.

128. The Court finds that the failure to appoint Dr. Allen to fill the permanent Physician II position at Halawa following the open recruitment process was irregular. Specifically, the Court finds that the failure to appoint Dr. Allen to the Physician II position departed from the standard practices of the Department and violated the State of Hawaii's civil service regulations and the Collective Bargaining Agreement, and no legitimate basis was given for passing over him.

129. Mr. Iranon testified that he remembers almost nothing about the Physician II selection process, but claims that he was not significantly involved in any aspect of that selection process. The Court does not find this testimony credible. There are multiple memos directed or copied to Mr. Iranon about the process. Dr. Thorburn testified that she discussed the process with Mr. Iranon during their mediation on February 8th, which led to her memo to him on April 10, 1996. Moreover, it is undisputed that Mr. Iranon had ultimate hiring authority in the Department. The Court finds that Mr. Iranon inappropriately rejected Dr. Allen for the Physician II position. The Court further finds that retaliation was a motivating factor in Mr. Iranon's refusal to appoint Dr. Allen to the permanent Physician II position at Halawa.

130. Back on February 27th, 1996, Dr. Thorburn complained to Ted Sakai about "the constant interference with medical care and harassment, especially directed toward Dr. Allen at Halawa Correctional Facility." Dr. Thorburn suggested in her memo that "[t]his practice is so pervasive that it is my belief that facility administrative staff is soliciting information about any complaint that an inmate makes against Dr. Allen." Dr. Thorburn pleaded for Mr. Sakai to "[p]lease get this interference with medical care and harassment stopped."

131. Mr. Sakai responded to Dr. Thorburn's entreaty with a March 1, 1996 memo addressed to several members of the Halawa administration. The purpose of this directive was to set forth the proper procedures to be followed in the event of conflicts, and to ensure that the Administrator for the Health Care Division would have an opportunity to review all allegations against health care staff. Mr. Sakai testified at trial that none of the Internal Affairs investigations of Dr. Allen that began after this memo was circulated were proper. Pursuant to Sakai's memo, all of the disputes between Dr. Allen and Halawa staff should have been referred to Dr. Thorburn and resolved administratively. This was also the position of Plaintiff's experts.

132. On April 1, 1996, Mr. Sakai sent a memo to Mr. Penarosa ordering the LaPierre Internal Affairs investigation terminated. Mr. Sakai testified that he never varied from the position set forth in this memo.

133. Low testified that when he heard of the memorandum, he met with Sakai and explained that the investigation did not deal with the incident involving LaPierre's wrist, but rather, dealt with Dr. Allen's alleged retaliation against LaPierre. Low testified that Sakai authorized him to continue the investigations, but instructed him not to initiate any new ones.

134. During the course of the LaPierre investigation, Low interviewed several witnesses, including a psychiatrist, a psychologist, and medical personnel, who indicated they believed Dr. Allen's behavior toward LaPierre was improper. Dr. Allen testified that they were all biased against him for various reasons.

135. Dr. Allen was not advised that the LaPierre Internal Affairs investigation had been ordered terminated. The day following Mr. Sakai's memo terminating the LaPierre investigation, and about a week after Dr. Thorburn tendered her resignation, Dr. Allen wrote to Mr. Iranon making a formal complaint "regarding a pattern of harassment, non cooperation, and hostile work environment which I am subject to at the Halawa Correctional Facility." Dr. Allen went on to write that "this treatment . . . constitutes retaliation for my 'whistle blowing' reporting of cases of abuse at the correctional facility." In this letter, Dr. Allen also references his problems with Internal Affairs, "who have been continuously investigating me for over a year, fomenting suspicions and distrust from my co-workers because of repeated interviews and requests for statements against me."

136. Mr. Iranon responded to Dr. Allen on April 9, 1996. He stated in his letter that he would forward some of Dr. Allen's complaints to Dr. Thorburn for resolution, but that his "preliminary inquiry does not support your allegations regarding Internal Affairs." In his trial testimony, Mr. Iranon did not describe the nature or findings of his "preliminary inquiry." Mr. Iranon then asked Dr. Allen to forward to him in writing specific information about how Internal Affairs was harassing him.

137. The next day, Mr. Sakai forwarded Dr. Allen's letter to Dr. Thorburn, asking her to investigate the allegations regarding the nursing staff and report her findings to him in writing by April 17th.

138. On April 17th, Dr. Thorburn sent a five page single-spaced memo to Mr. Sakai detailing her findings regarding Dr. Allen's allegations. Dr. Thorburn wrote, not surprisingly, "[m]y investigation supports Allen's allegations that he is subjected to persistent investigations and general undermining by some of his co-workers creating a harrassing [sic] and hostile work environment. There is evidence that Internal Affairs Investigator Low and nurses Keliipio and Kyser [sic] are instrumental in creating the hostile work environment." She then gave her reasons for this conclusion. She first stated, "[s]everal of the staff provided information that suggests ongoing investigations related to LaPierre (despite Internal Affairs claims that they have been discontinued) and other patient-related matters." She went on to explain that many of the allegations against Dr. Allen were for carrying out Division policies and directives. She questioned the propriety of Internal Affairs investigating matters of medical judgment and decision-making, and explained that these are matters for peer review. She called the allegations by Mr. LaPierre "laughable." She also observed that "[f]or over a year, we have not felt the support of the Department," and concluded that "[i]t is a hostile environment."

139. The same day that Dr. Thorburn sent her findings to Mr. Sakai, Raymond Low sent his own memo to Mr. Sakai. Mr. Low's memo accused Dr. Thorburn of interfering in his continuing investigation

of the LaPierre case. Mr. Low stated at the outset of his memo that "I have received several calls last week regarding Dr. Thorburn questioning medical staff about an Internal Affairs' investigation into alleged misconduct of Dr. Allen."

140. There was no response by the administration to Dr. Thorburn's findings. Mr. Iranon testified that he thought Dr. Thorburn would handle it. But by April, Dr. Thorburn already had announced her resignation, although she did not actually leave Halawa until June.

141. The Court finds as credible the testimony of Gregg Takayama who testified that the Director of PSD should be aware of all ongoing Internal Affairs investigations. The Court finds that Mr. Iranon was advised or knew of the initiation and continuation of these investigations.

142. In October 1996 and again in June 1997, Mr. Penarosa approved press conferences for Mr. LaPierre to announce taking action against Dr. Allen. In October 1996, Mr. Penarosa facilitated LaPierre's access to the press to announce a "hunger strike" against Dr. Allen. In June of 1997, Mr. Penarosa approved a press conference at which Mr. LaPierre announced his lawsuit against Dr. Allen and Dr. Thorburn.

143. Mr. Penarosa approved of a request that Mr. LaPierre be provided with a computer in his cell so that he could transcribe his medical records in order to assist Low in the IA investigation against Dr. Allen. The Court finds that the provision of a computer to this maximum custody inmate was unusual.

144. In February 1997, after being named the head of Internal Affairs, Guy Hall initiated another Internal Affairs investigation into an incident which had occurred six months earlier, between Dr. Allen and Dietician Carolyn Grimmett. In July 1996, Ms. Grimmett complained to Dr. Taniguchi because Dr. Allen had verbally abused her. Apparently, Dr. Taniguchi mediated and nothing further was heard until Ms. Grimmett spoke to Guy

Hall about this incident in February 1997. Hall testified that the IA investigation was initiated because Grimmett informed him, in a chance meeting between the two, that Taniguchi had not resolved the matter to her satisfaction. Although disciplinary action against Dr. Allen for verbally abusing Ms. Grimmett would have been appropriate, the Court finds the initiation of an IA investigation to be inappropriate, and intended as retaliation against Dr. Allen by Defendant Guy Hall.

145. Dr. Allen testified that, while serving as Acting Physician II, he was being paid at the rate of $86,000.00 per year. He estimated that the salary for a regular Physician II was $95,985.00 per year.

146. On February 13, 1997, Dr. Allen was notified of a hearing to be conducted February 20, 1997, on the complaints involving Dr. Allen's altercations with the nurses. The hearing was continued two times at Dr. Allen's request, and was finally set for April 22, 1997.

147. In March 1997, Dr. Allen and Dr. Thorburn decided to move to the mainland since Dr. Thorburn had secured a position at the Spokane Health Department.

148. On April 17, 1997, Dr. Allen submitted his resignation.

149. On April 24, 1997, Dr. Allen and Dr. Thorburn were married.

150. In May 1997, Dr. Thorburn moved to the mainland.

151. Dr. Allen worked part time at a clinic in Spokane in May, June, and July of 1997, and was then out of work until he secured a full time job in October 1997.

152. According to Dr. Allen, he earned $44,921.00 in 1997, $75,000.00 in 1998, and will earn $75,000.00 in 1999.

153. Although the Court finds that Defendants acted inappropriately towards Dr. Allen, the Court finds that Dr. Allen acted inappropriately as well, and contributed to the problems he encountered at Halawa due to his uncooperative and demeaning

attitude towards others. Furthermore, the Court finds that Dr. Thorburn's vigorous support for Dr. Allen ultimately impaired the relationships she had developed with the administration, her co-workers, and her subordinates.

### CONCLUSIONS OF LAW

1. This Court has jurisdiction over this case pursuant to 28 U.S.C. Section 1343 and 1331.

2. Plaintiff claims that he has been illegally harassed and retaliated against by the three Defendants who acted as part of an illegal conspiracy against him. Plaintiff claims that all of the Defendants' actions constituted retaliation against him for exercising his First Amendment right to speak out about inmate abuse at Halawa Correctional Facility.

3. Section 1983 provides, in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ..., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured[.]

42 U.S.C. § 1983.

■ 4. Section 1983 does not in itself create any substantive right of action, but merely provides a statutory remedy when a plaintiff demonstrates either a deprivation of a constitutional right or a right secured by federal law. *See Livadas v. Bradshaw,* 512 U.S. 107, 132, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994); *Maher v. Gagne,* 448 U.S. 122, 129 n. 11, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980); *Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 617–18, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979).

■ 5. As stated by the Ninth Circuit in *Taylor v. List:*

Liability under section 1983 arises only upon a showing of personal participation by the defendant. A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them. There is no respondeat superior liability under section 1983.

880 F.2d 1040, 1045 (9th Cir.1989) (internal citation omitted); *See also Collins v. City of Harker Heights, Tex.,* 503 U.S. 115, 123, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). However, the Ninth Circuit recently expanded this holding in *Gilbrook v. City of Westminster:*

[P]ersonal participation is not the only predicate for section 1983 liability. Anyone who "causes" any citizen to be subjected to a constitutional deprivation is also liable.... [T]he requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.

177 F.3d 839, 853 (9th Cir.1999) (citing *Johnson v. Duffy,* 588 F.2d 740 (9th Cir. 1978)) (internal citations omitted). The Ninth Circuit went on to state:

[E]ven though a final decision-maker may stand between the wrongfully motivated subordinate and the plaintiff, the element of causation is satisfied if the final decision-maker "would not have considered dismissing the plaintiff if the wrongfully motivated subordinate had not brought charges in reprisal for protected activity" in the first place ... a subordinate cannot use the nonretaliatory motive of a superior as a shield against liability if that superior never would have considered a dismissal but for the subordinate's retaliatory conduct.

*Id.* at 854–855.

■ 6. Proof of negligence is insufficient to support a claim under Section 1983. *See Davidson v. Cannon,* 474 U.S.

344, 347, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986); *Redman v. County of San Diego,* 942 F.2d 1435, 1440 (9th Cir.1991).

■ 7. The Ninth Circuit has held that, to make a successful claim for wrongful retaliation under the First Amendment and Section 1983, a plaintiff must prove that "(1) the statement that brought on the retaliation is one of 'public concern;' (2) the constitutionally protected expression is a 'substantial' or 'motivational' factor in the employer's adverse [employment] decision or conduct;[1] and (3) the interests of the plaintiff/employee in commenting on the matter of public concern outweigh the state's interest in maintaining efficient public services." *Sanchez v. City of Santa Ana,* 936 F.2d 1027, 1038 (9th Cir.1990), *cert. denied,* 502 U.S. 957, 112 S.Ct. 417, 116 L.Ed.2d 437 (1991). "If these ... requirements are satisfied, defendants must demonstrate by a preponderance of the evidence that the same employment decisions would have been reached even if [plaintiff] had not engaged in constitutionally protected conduct." *Peacock v. Duval,* 694 F.2d 644, 645 (9th Cir.1982); *see also Rendish v. City of Tacoma,* 123 F.3d 1216 (9th Cir.1997).

■ 8. "[T]he mere fact that protected speech precedes an employment decision does not create the inference that the speech motivated the employment decision." *O'Connor v. Chicago Transit Authority,* 985 F.2d 1362, 1368 (7th Cir.1993).

9. A conspiracy to interfere with civil rights is defined as follows:

a combination of two or more persons, by concerted action to accomplish some unlawful purpose, or to accomplish some lawful purpose through unlawful means.... The essence of a conspiracy is a combination or agreement to violate or disregard the law.... In order to prove that a conspiracy existed, the plaintiff must show that members of the conspiracy in some way or manner, or through some contrivance, positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan.

E. Devitt, C. Blackmar & M. Wolff, Federal Jury Practice and Instructions § 103.23 (4th ed. 1987) (Devitt, Blackmar & Wolff); *see also United Steelworkers of America v. Phelps Dodge Corp.,* 865 F.2d 1539, 1549 (1989).

■ 10. Under Section 1983, each participant in the conspiracy to deprive Dr. Allen of his civil rights may be liable for damages. "To be liable, each participant need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy." *Phelps Dodge,* 865 F.2d at 1541 (citing *Fonda v. Gray,* 707 F.2d 435, 438 (9th Cir.1983)).

■ 11. In Hawaii, the statute of limitations for actions under Section 1983 is two years from the date of the violation. *See* Haw.Rev.Stat. § 657–7 (1993); *Silva v. Crain,* 169 F.3d 608, 610 (9th Cir.1999) ("[C]ourts considering § 1983 claims should borrow the general or residual statute for personal injury actions."). However, the continuing violations doctrine tolls the statute of limitations for alleged violations that form part of a pattern of ongoing unlawful conduct. A "systematic policy of discrimination is actionable even if some or all of the events evidencing its inception occurred prior to the limitations period." *Williams v. Owens–Illinois, Inc.,* 665 F.2d 918, 924 (9th Cir.1982); *see also Grimes v. City and County of San Fran-*

---

1. Courts have construed the term "adverse employment decision" very broadly, and this requirement has been satisfied by discharges, demotions, refusals to hire, reprimands, disadvantageous transfers, refusals to promote, unfavorable job evaluations, and other similar actions. *See, e.g., Green v. Safeway Stores,* 1998 WL 898366, *2 (N.D.Cal. Dec.14, 1998); *Williams v. State Bar of Cal.,* 1998 WL 397902, *3 (N.D.Cal. July 13, 1998); *Anthony v. County of Sacramento,* 898 F.Supp. 1435, 1443 (E.D.Cal.1995); *Pierce v. Texas Dep't of Crim. Justice Inst. Div.,* 37 F.3d 1146, 1149 (5th Cir.1994); *Haimovitz v. United States Department of Justice,* 720 F.Supp. 516, 526 (W.D.Pa.1989).

*cisco*, 951 F.2d 236, 238–39 (9th Cir.1991). "A continuing violation may ... be established ... by demonstrating a series of related acts against a single individual," one or more of which falls within the limitations period. *Green v. Los Angeles County Superintendent of Schools*, 883 F.2d 1472, 1480–81 (9th Cir.1989). The key inquiry to determine if the doctrine applies is whether the alleged improper acts are sufficiently related to constitute a continuing violation. *See Anthony v. County of Sacramento, Sheriff's Department*, 845 F.Supp. 1396, 1402 (E.D.Cal. 1994) (citing *Green*, 883 F.2d at 1480–81). Here, the Court finds that the statute of limitations does not bar any of Plaintiff's claims, since all of the allegations are sufficiently related to constitute a continuing violation.

 12. The Court finds and concludes that the Defendants positively or tacitly came to a mutual understanding among themselves to harass Dr. Allen. Such understanding between Defendants was to retaliate against Dr. Allen for exercising his Constitutional right to free speech.

13. The Court further finds and concludes that the Defendants, and each of them, did retaliate against Dr. Allen by harassing him. In addition, the Court finds and concludes that Mr. Iranon retaliated against Dr. Allen by preventing or failing to approve of Dr. Allen's appointment to the permanent Physician II position at Halawa Correctional Facility.

14. This Court already has held that the Defendants were acting under color of State law and that Dr. Allen's allegations of unlawful retaliation, if proven, support a claim under Section 1983 via the First Amendment. *See* Order (1) Granting Plaintiff's Motion for Partial Summary Judgment on the Issue of Public Concern; (2) Denying Defendants' Motion for Summary Judgment; (3) Denying Plaintiff's Cross–Motion for Summary Judgment; and (4) Denying Plaintiff's Motion to Strike ("Order") at 13. The Government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in free speech." *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

 15. "Employee expression that can be fairly considered as relating to a matter of political, social, or other concern of the community may be characterized as speech involving a matter of public concern." *Voigt v. Savell*, 70 F.3d 1552, 1559 (9th Cir.1995), *cert. denied*, 517 U.S. 1209, 116 S.Ct. 1826, 134 L.Ed.2d 931 (1996); *see also Chateaubriand v. Gaspard*, 97 F.3d 1218, 1222 (9th Cir.1996). Speech that enables the population to "make informed decisions about the operation of their government merits the highest degree of first amendment protection." *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir.1983). The Court already has held, as a matter of law, that Dr. Allen's speech regarding prisoner mistreatment and abuse addressed issues of public concern. *See* Order at 16. More specifically, the Court held that Dr. Allen's interview by Deputy Attorney General Thomas Farrell, his interview with the Honolulu Advertiser, and his testimony before the State Legislature constituted constitutionally protected speech. *See* Order at 24. The Court, after hearing all the evidence presented at trial, reiterates these findings.

 16. The magnitude of retaliation imposed to discourage the exercise of First Amendment rights "need not be particularly great in order to find that rights have been violated. A person's rights are unconstitutionally infringed both where the government fines a person a penny for being a Republican and where it withholds the grant of a penny for the same reason." *Hyland v. Wonder*, 972 F.2d 1129, 1135 (9th Cir.1992), *cert. denied*, 508 U.S. 908, 113 S.Ct. 2337, 124 L.Ed.2d 248 (1993) (internal citations and quotation marks omitted).

17. The Court concludes that Plaintiff's protected conduct was a substantial and motivating factor in Defendants' campaign of harassment, and retaliatory employment action.

18. Furthermore, the Court concludes that Defendants engaged in a conspiracy to deprive Plaintiff of constitutionally protected rights to free speech in violation of 42 U.S.C. § 1983.

19. Dr. Allen claims that he was constructively discharged by the actions of the Defendants. In order to establish constructive discharge, Dr. Allen must show that a "reasonable person in his position would have felt that he was forced to quit because of intolerable and discriminatory working conditions." *Schnidrig v. Columbia Machine, Inc.*, 80 F.3d 1406, 1411 (9th Cir.1996), *cert. denied,* 519 U.S. 927, 117 S.Ct. 295, 136 L.Ed.2d 214 (1996). Given the fact that Dr. Allen was inappropriately locked out on three separate occasions, was the subject of several IA investigations on matters which should not have been referred to IA, and was inappropriately passed over for the Physician II position, along with several other instances demonstrative of a hostile work environment, the Court finds that Dr. Allen was constructively discharged. However, the Court reiterates its repeated finding that many problems Dr. Allen encountered were caused, at least in part, by his own conduct.

20. The Court finds that the evidence produced to establish damages was somewhat questionable and speculative, and, as acknowledged by Dr. Allen, he "estimated" what the Physician II salary would be "out of [his] past experience" as Acting Physician II. Furthermore, Dr. Allen acknowledged that his estimated future earnings were "for a projected salary" based on his current position. The Court finds that his projected salaries are speculative and unsubstantiated, and further finds that, by the year 2000, Dr. Allen's salary in his new position should be commensurate with what he would have been earning at Halawa had he not resigned. As a result of the foregoing, the Court finds that Dr. Allen is entitled to damages in the amount of $111,-000.00. Specifically, the Court concludes that Dr. Allen is entitled to damages for: (1) lost wages in the amount of $51,000.00 for 1997, $20,000.00 for 1998, and $20,-000.00 for 1999;[2] (2) emotional distress, humiliation and embarrassment in the amount of $10,000.00; and (3) loss of reputation in the amount of $10,000.00.

21. With regard to overtime pay, the Court finds that Dr. Allen's projection for overtime was totally unsubstantiated and speculative. Dr. Allen acknowledged at trial that his overtime projections were "a guesstimate, at most," and that, in fact, he received very little overtime in 1996, since "Dr. Taniguchi wouldn't approve overtime." Consequently, the Court finds that Dr. Allen has failed to establish any loss of overtime pay.

22. The purpose of punitive damages is not to compensate a plaintiff, but rather, to punish a defendant "for aggravated or outrageous misconduct and to deter the defendant and others from similar conduct in the future." *Masaki v. General Motors Corp.*, 71 Haw. 1, 6, 780 P.2d 566 (1989). In order to recover punitive damages:

> the plaintiff must prove by clear and convincing evidence that the defendant has acted wantonly or oppressively or with such malice as implies a spirit of mischief or criminal indifference to civil obligations, or where there has been some wilful misconduct or that entire want of care which would raise the pre-

---

2. Neither party submitted any evidence or testimony concerning discounting future earnings. Should either party consider a discount appropriate for the value of Dr. Allen's unearned 1999 income, such party may submit, within twenty (20) days, data for an appropriate discount, and the other party may submit any opposition within seven (7) days thereafter.

sumption of a conscious indifference to consequences.

*Kunewa v. Joshua,* 83 Hawai'i 65, 73, 924 P.2d 559 (1996). The Hawaii Supreme Court has instructed that "the proper measurement of punitive damages should be the degree of malice, oppression, or gross negligence which forms the basis for the award and the amount of money required to punish the defendant...." *Kang v. Harrington,* 59 Haw. 652, 663, 587 P.2d 285 (1978). The Court finds that punitive damages are not warranted in this case, because Defendants' conduct, while inappropriate, did not rise to the level of egregiousness required to justify such an award.

23. "In any action or proceeding to enforce a provision of section[ ] ... 1983 ..., the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b). The Court finds that Plaintiff is entitled to reasonable attorneys' fees and costs reasonably incurred in the prosecution of this case and Plaintiff may file a post-trial motion accordingly.

24. Where appropriate, findings of fact shall operate as conclusions of law, and conclusions of law shall operate as findings of fact.

IT IS SO ORDERED.